IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | |
| | § | 2:14-CR-0086 |
| FRANCISCO JOSUE BELTRAN | § | |

## REPORT AND RECOMMENDATION
## TO DENY DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the Court is a Motion to Suppress filed by defendant Francisco Josue Beltran. On February 4, 2015, a hearing was held on the motion to suppress. Present at the hearing were defendant Francisco Josue Beltran, Mr. Bill Zhudi, counsel for Defendant, and counsel for the government. After consideration of the evidence, the pleadings, and arguments of counsel, the undersigned recommends the Motion to Suppress be DENIED.

I.
FACTUAL BACKGROUND

On October 30, 2014, at approximately 7:37 a.m. in Carson County, Texas, Department of Public Safety (DPS) Trooper Danny Nunez saw a Jeep SUV that appeared to be traveling faster than the posted 75 miles per hour speed limit. Nunez activated his radar, confirmed the Jeep was traveling 80 miles per hour, and initiated a traffic stop.

Trooper Nunez testified that upon stopping the Jeep, which had Arizona license plates, he exited his patrol car and approached the jeep from the passenger side. He noticed the car appeared to be very clean, other than fast food wrappers on the front seat. Nunez identified himself and explained the

reason for the stop. Trooper Nunez asked defendant Beltran for his driver's license and the car's registration. Nunez testified defendant's hand shook as he handed over the papers. Nunez testified the level of nervousness exhibited was unusual for a routine traffic stop.

Trooper Nunez had defendant Beltran exit the Jeep and sit in the passenger seat of the patrol car. Once in the patrol car, Nunez noticed that defendant Beltran appeared tired. Defendant Beltran explained he was traveling to Oklahoma City to visit his brother, but said that he did not know his brother's address, and would have to call his brother when he arrived in Oklahoma City. Throughout this exchange Trooper Nunez testified that Beltran appeared extremely nervous and chewed his gum aggressively at times. When asked how long he would be in Oklahoma City, defendant Beltran initially said a couple of days, but then stated he would be there a week. Trooper Nunez explained that Beltran alternated between bouts of nervous action and unusual stillness in which he exhibited a "thousand yard stare." Nunez testified these actions were "indicators" that "criminal activity [was] afoot." *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010).

After asking additional basic questions, Trooper Nunez, while waiting for the return on the criminal history and warrant checks, asked defendant Beltran if he had ever been arrested. Defendant Beltran responded that he had been arrested a long time ago. Nunez asked if the arrest was for "little things," and defendant Beltran agreed. Trooper Nunez testified that after he informed the defendant he would only receive a warning, Defendant Beltran remained so nervous that he had trouble signing the warning citation. Nunez testified the return on Beltran's criminal history report indicated an arrest for possession of a controlled substance in Nebraska in 2011, and that this contradicted Beltran's earlier confirmation that he had only been arrested for "little things." Trooper Nunez then asked the year model of the Jeep to which Beltran replied "'04." He asked if Beltran had had any recent work done on the Jeep, and Defendant Beltran replied he had not. Trooper Nunez, while waiting for the records

check return also requested a "border check." The "border check" showed the Jeep had recently crossed the border between the United States and Mexico.

Trooper Nunez then gave Defendant Beltran the completed warning, advised him the warning carried no fine, and returned the registration papers and Beltran's driver's license. After returning these documents to Beltran, Trooper Nunez asked if Beltran would answer a couple of questions. Beltran responded that he would. Nunez asked Beltran if he was transporting several different types of contraband. As Trooper Nunez identified said each specific type of contraband, Beltran responded, "No, nothing," but when Trooper Nunez asked about methamphetamine, Beltran responded with a simple "no," omitting the "nothing" which had followed the response regarding other types of contraband. While defendant Beltran contends he was interrupted by Trooper Nunez before he could finish the "nothing" part of the phrase, it does not appear from the video that Trooper Nunez rushed his next question. Trooper Nunez then asked if he could search the Jeep. Beltran asked "why," and Nunez again asked if he could search the Jeep. Defendant Beltran answered in the affirmative, and Trooper Nunez confirmed that Beltran was consenting to the search. Trooper Nunez told defendant Beltran to stay in the car and that if he needed anything he could open the door and "holler." Trooper Nunez testified he left Beltran in the patrol car because of the cold temperature outisde.

Trooper Nunez then began searching the vehicle. Shortly after starting the search, Trooper Nunez was joined by DPS Trooper Max Honesto. When Trooper Honesto arrived, both troopers turned off their body microphones. At the hearing, Trooper Nunez testified this was so the troopers could "conversate" but later stated it was so the microphones would not cause interference with each other or the video recording. During the search, Trooper Nunez observed that the Jeep's plastic bumper cover had both old and new grommets, leading him to believe the bumper cover had recently been removed. At some point in the search, Trooper Honesto moved Defendant Beltran to his patrol car to speak with

him while Trooper Nunez continued the search. Trooper Nunez then inspected the bumper of the Jeep more closely, crawling under the Jeep and using a flashlight. While under the Jeep, Trooper Nunez testified he observed hand (or finger) prints on the underside of the bumper cover, which indicated to him that the cover had, in fact, been removed.

Believing the Jeep contained contraband, Trooper Nunez contacted EPIC (the El Paso Intelligence Center) and requested they run a more advanced and detailed record search. Trooper Honesto called Trooper Nunez on his cell phone while he was in the car with Defendant Beltran to discuss what to do next. Trooper Nunez said, "let me get underneath it, then, . . . we'll . . . probably take it to the shop, and if he don't want to, I'll call a dog, and we'll take it from there." The Troopers testified that while they were on the phone with each other, Trooper Honesto informed Defendant Beltran that they knew he was "loaded" and asked if he would drive the Jeep to their shop for further inspection. Trooper Honesto testified Beltran laughed and said "let's go."

Trooper Nunez then removed Beltran's cell phone from the Jeep, which Trooper Nunez testified was done for the purpose of officer safety. He also testified he did not inform Beltran he had removed the cell phone. All three vehicles were then driven to the DPS office. The drive, which Trooper Nunez testified was about an eight-mile trip, took approximately fifteen minutes. During the trip to the DPS office, Trooper Nunez received information from EPIC, advising him they had discovered Beltran was the subject of an ongoing drug investigation.

Once at the DPS shop, the vehicle was placed on a lift. Trooper Honesto testified that he then began inspecting the front part of the vehicle while Trooper Nunez inspected the back. Trooper Nunez testified that his sergeant arrived shortly thereafter and spotted the fingerprints on the bumper cover. Trooper Nunez testified that he peered into a drain hole in the bumper and saw cellophane-wrapped type packages. He then used a metal rod which the DPS troopers called a hook to remove the packages from

the vehicle. The troopers discovered twenty three bundles of contraband, weighing approximately twenty-four pounds. The substance field tested positive for methamphetamine.

## II.
## DEFENDANT'S CONTENTIONS

Defendant Beltran contends:

1. The initial detention was unlawful and the initial consent was not voluntary.

2. The consent to the second search of the jeep at the DPS shop was not voluntary.

## III.
## DISCUSSION

### A. Prolonged Detention

The Fourth Amendment to the United States Constitution protects individuals from unreasonable searches and seizures. *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003). A traffic stop constitutes a seizure under the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). To determine whether a seizure, including a traffic stop, was reasonable, a reviewing court must consider (1) "whether the officer's action was justified at its inception," and (2) "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

Beltran does not contend the traffic stop and his initial detention for speeding were unlawful. Rather, Beltran claims the continuation of the detention after Nunez returned Beltran's identification documents was unconstitutional because Beltran was not told he was free to go and was not told he was

free to decline to answer additional questions.[1] Beltran also contends the continuation of the stop was not consensual because a reasonable person would not have felt free to leave. To prevail, Beltran must demonstrate the following: (1) his detention was not reasonably related in scope to the circumstances which justified the interference, *i.e.*, the initial stop, (2) a reasonable person in a similar position would not have felt free to leave, and (3) Trooper Nunez had not developed reasonable suspicion sufficient to justify a continuation of the initial detention.

Even if it is assumed, for purposes of argument, that the initial detention was only reasonable until Trooper Nunez ran the warrant check and issued a warning citation, Beltran's constitutional rights were not violated because everything that occurred after the return of Beltran's driver's license, registration, and the written warning happened during a consensual encounter. As the government first argues, the encounter following the return of the driver's license and other registration papers was consensual because a reasonable person in Beltran's position would have felt free to leave. The Fifth Circuit and other circuit courts have held that a reasonable person, having received back from an officer all documents necessary for travel, would feel free to decline to answer additional questions from an officer, and would feel free to decline a request to search a vehicle. *United States v. Sanchez-Pena*, 336 F.3d 431, 443 (5th Cir. 2003). Indeed, the Fifth Circuit panel in *Sanchez-Pena* cited favorably to a case in which an encounter was deemed consensual after the return of all travel documents even though the additional questioning occurred while the defendant sat in the officer's patrol car, as in this case. *Id.* (citing *United States v. Lattimore*, 87 F.3d 647, 652 (4th Cir. 1996)). Thus, Beltran's claim that he was unconstitutionally detained after the return of all travel documents and the conclusion of the traffic stop

---

[1] While "knowledge of the right to refuse consent is one factor" in determining the voluntariness of consent, officers are not required to inform a person who has been detained of their right to refuse to consent to a search or answer additional questions. *See Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 421, 136 L.Ed.2d 347 (1996) (rejecting an Ohio Supreme Court ruling requiring officers to inform detainees that they are free to go before an encounter would be considered consensual).

fails because he consented to the continuation of the encounter. *See Sanchez-Pena*, 336 F.3d at 443.

Alternatively, even if the continuation of the stop after Beltran's travel documents were returned was not a consensual encounter, Trooper Nunez had developed sufficient reasonable suspicion to legally continue the detention. The government gave a list of reasons in support of its contention that reasonable suspicion existed. The first of these reasons, Trooper Nunez's experience working in drug interdiction, his training, and his education are not sufficient to justify reasonable suspicion by themselves. *See United States v. Brigham*, 382 F.3d 500, 517 (5th Cir. 2004) ("[The officer's] experience . . . does not provide the officer with a *carte blanche* to make non-particularized and non-objective inferences"). An officer's experience and expertise are a consideration and may validate the officer's interpretations of other, independent facts that an ordinary citizen might not consider significant, but justifying reasonable suspicion based upon an officer's expertise alone is little more than a license for an officer to detain a suspect based upon a hunch, and reasonable suspicion must be based upon articulable facts, not "mere hunch[es]." *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883. Trooper Nunez identified a number of articulable facts. First, Trooper Nunez testified Interstate 40 is a well known drug-trafficking corridor. Nunez found Beltran's story about visiting his brother in Oklahoma suspicious because Beltran did not know where in Oklahoma City his brother lived. Next, Trooper Nunez testified that Beltran appeared overly nervous throughout the encounter as evidenced by his nervous shaking, aggressive gum chewing, and thousand-yard stare. Records also indicate Beltran's jeep had recently crossed into the United States from Mexico, and Trooper Nunez testified that Mexico is a source location for drugs. Further, Nunez testified that defendant Beltran's criminal history showed a previous drug arrest, which he believed Beltran had either denied or tried to minimize the severity of. When Nunez asked Beltran about the arrest, Beltran said "Long time." Nunez said "long time ago" and "little stuff?" Beltran responded, "Yeah." In reality, the arrest was for a serious felony and had

occurred only a short time earlier. All of these factors, taken together and viewed in light of Trooper Nunez's experience, are sufficient to support reasonable suspicion that there is "a fair probability contraband or evidence of a crime will be found." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989).

Defendant Beltran's counsel attempts to challenge the existence of reasonable suspicion by arguing the suspicious factors identified were potentially innocent. For example, Beltran argued his shaking could have been the product of the cold weather and the border crossing could have been a visit to family in Mexico. Wholly lawful conduct, however, is sufficient to justify a finding of reasonable suspicion, if it, when taken together, and considered under the totality of the circumstances, warrants further investigation. *Id.* ("In making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts."). Thus, the relevant inquiry is not whether the actions lacked any innocent explanation whatsoever, but whether it was reasonable for Trooper Nunez, considering the evidence before him, to suspect that "contraband or evidence of a crime [would] be found."

Defendant Beltran also challenged the motivation of the officer, arguing that the officer was "making a record" from the moment the stop began. While it is true that Trooper Nunez spoke into his microphone, listing some sources of suspicion from the moment the stop began, this is not constitutionally problematic. First, under the Fourth Amendment, the subjective intentions of Trooper Nunez are simply not relevant. *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 1774, 135 L.Ed.2d 89 (1996). Second, Trooper Nunez testified to his vast experience in highway drug interdiction. The fact that Trooper Nunez became suspicious early on and began looking for indicators of illegal activity does not taint the evidence developed during the traffic stop. This is particularly so here since defendant Beltran consented to the initial search. An officer may request consent during a

consensual encounter without reasonable suspicion. *United States v. Sanchez-Pena*, 336 F.3d 431, 441 (Fifth Cir. 2003) ("[consensual encounters] do not implicate Fourth Amendment protections such as the requirement of reasonable suspicion.").

Here, however, Nunez had developed reasonable suspicion and, because he had, was entitled to continue the detention for a reasonable period to either confirm or dispel his suspicion. The reasonableness of the twelve minute duration of the stop *prior to* the return of the driving documents is not at issue. All that is at issue are the few seconds after the return of the driving documents until defendant Beltran's consent to the search. The few seconds it took to ask the few additional questions and ask for consent to a search was not an unreasonable amount of time to investigate Trooper Nunez's reasonable suspicion.

Because the search of Beltran's vehicle followed a consensual encounter or, alternatively, because Officer Nunez had developed reasonable suspicion prior to the end of the investigation of the initial traffic offense, the search was valid provided the consent to the search was voluntary.

### B. The Consent to Search

Even though the request for consent to search the vehicle did not occur during an illegal detention, the consent given must still be shown to have been voluntary. Whether consent is voluntary is judged by a six-factor test: (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Jenson*, 462 F.3d 399, 406 (5th Cir. 2006).

The first three factors weigh in favor of the government. As set out previously, the encounter

became consensual. At the time Trooper Nunez sought consent to search the vehicle, he had returned all of defendant's documents to him along with a warning for speeding. The detention had lasted for approximately thirteen minutes when Beltran was asked for his consent to search, the majority of which time the Trooper was running routine computer checks. Trooper Nunez did not act in a coercive fashion. To the contrary, the officer was very polite and professional throughout the duration of his encounter with defendant. Likewise, defendant was very cooperative with Trooper Nunez, engaging in friendly conversation with the officer. From the recording of the encounter, defendant Beltran seemed to understand and was able and willing to communicate with Trooper Nunez.

Regarding the fourth factor, there is evidence regarding the defendant's awareness of his right to refuse to consent. During a previous encounter with law enforcement authorities in Nebraska, which resulted in his arrest for possession of methamphetamine, defendant Beltran declined to consent to a search of his person, but allowed the police to search his luggage. While Beltran was not advised of his right to refuse consent, the testimony regarding his refusal in the earlier Nebraska case is evidence Beltran was aware of his right to refuse consent.

As to the fifth factor, there is no evidence before the Court that defendant's education and intelligence were inadequate to allow him to understand the officer's request and the implications of his consent.

Lastly, there is no direct evidence before the Court regarding defendant's belief that incriminating evidence would or would not be discovered if the vehicle was searched, but given how carefully the contraband was hidden, in the frame rails of the Jeep, it is reasonable to suspect that Beltran believed the methamphetamine would not be found. Based on the totality of these factors, the Court finds Beltran's consent to the initial roadside search was voluntary. *See Kelley*, 981 F.2d at 1470.

## C. The Second Search

Defendant Beltran's consent to the second search also appears to have been during a consensual encounter. Where a traffic stop has devolved into a consensual encounter, and consent to a change of location and submission to an additional search is voluntarily given, the search does not violate the Fourth Amendment. *See United States v. Sanchez-Pena*, 336 F.3d 431, 443 (5th Cir. 2003) (holding a search during a consensual encounter did not violate Fourth Amendment where defendant agreed to travel to a check point where a free air sniff was performed). Thus, if the consent was given during a consensual encounter, the search was valid if consent to the search was given voluntarily.

While the Court finds the consent to a second search occurred during a consensual encounter, there are some factors that weigh against Beltran's custodial status remaining consensual. Beltran contended at the suppression hearing that because one of the Jeep's doors was open and the spare tire was outside of the vehicle, he would not have felt free to leave when he gave his consent to Trooper Honesto. But as discussed above, Beltran had everything he needed to travel legally. Closing a passenger side door can hardly be deemed a serious impediment to leaving the scene of the stop, nor would opening the back hatch of the SUV and replacing the spare tire. While leaving would have been easier if the door to the car had been closed and the spare tire had been inside the vehicle, the existing situation was not so difficult as to be coercive. In those cases in which it has been found the defendant was not able to leave, the overriding factor is generally some sort of restraint or legal impediment to leaving the scene, such as the police officers retaining possession of the defendant's travel documents. *E.g., United States v. Dortch*, 199 F.ed 193, 198 (5th Cir. 1999). Additionally, Trooper Nunez testified that if defendant Beltran had expressed a desire to end the search and leave, the troopers would have loaded the spare tire and allowed Beltran to be on his way. Ultimately, whether or not the encounter was consensual only goes to the weight of the first factor in the "voluntariness of the consent" analysis

because, as set forth below, the Court finds there was reasonable suspicion to support a continued detention even if the encounter was not consensual.

Even if the encounter was no longer consensual and defendant Beltran was being detained, the officers had reasonable suspicion to detain Beltran. All of the factors discussed above which supported reasonable suspicion initially, apply with equal force to the continued detention. Additionally, during the first search, Trooper Nunez identified finger or handprints under the car's back bumper, and he observed new bumper grommets. Trooper Nunez explained that the only reason for new grommets would be if the bumper cover had been removed, because the old grommets would become weathered and would crack when the bumper was removed. Trooper Nunez further explained that because there was no bumper damage, there was no discernable legitimate reason to have removed the bumper cover. Additionally, he testified that in his experience working as a trooper in drug interdictions, he had found drugs hidden in that type of vehicle using the same method of removing the bumper cover to access the vehicle's hollow support rails, which were then used to hide contraband.

Defendant Beltran challenges Trooper Nunez's testimony of finding the fingerprints at the initial roadside search, pointing out on cross examination that Nunez did not tell Trooper Honesto about the fingerprints or grommets at the scene and did not mention either finding in his incident report except to the extent Trooper Nunez's superior officer made these observations while the car was on the lift at the DPS shop. Trooper Nunez, however, was unequivocal in his testimony that he discovered the fingerprints and new grommets at the roadside during the initial search. Trooper Nunez's contention is not without support. In the video, Nunez can be heard in a phone call with Trooper Honesto explaining that one of their options following the completion of the roadside search was for him get back under the vehicle to continue his investigation, indicating that he had seen something suspicious under the vehicle and wanted to investigate further. Additionally, the reason Trooper Nunez expressed

for taking the vehicle to the shop was to use the shop's lift to investigate the underside of the vehicle, indicating something under the vehicle had raised his suspicion. In the end, of course, this is a credibility determination. While the failure to mention the evidence found on the bumper in his report is a factor in assessing Trooper Nunez's credibility, there was no testimony that cast doubt on Trooper Nunez's claim that any failure to mention the fingerprints on the bumper was anything other than a simple mistake. The Court finds Trooper Nunez's testimony that he observed the fingerprints and new grommets on the bumper of the jeep at the initial stop was credible, based upon the factors applicable to credibility determinations.

These observations of Trooper Nunez warranted a continued detention for further investigation. Taking the vehicle to the DPS shop was an appropriately graduated response to the unfolding investigation.

Although there was reasonable suspicion to detain Beltran and take the vehicle to the DPS shop for further investigation and search, the court will address whether Beltran's consent to the second search was voluntary.

In analyzing the voluntariness of Beltran's consent, the six factors used to examine the voluntariness of the first search apply here as well. Regarding the presence of coercive police procedures, Beltran argues the placement of his luggage and spare tire outside of the vehicle amounted to coercion because he would not have felt free to leave. For the reasons set out previously, this factor weighs in favor of the government. Any contention that the seizing of Beltran's cell phone and the troopers' escorting of Beltran to the DPS station were coercive is not relevant since those events did not occur until after consent to the second search had already been given.

Beltran was cooperative throughout the investigation, continuing through the request to accompany the officers to the DPS station. Beltran even laughed about being asked to accompany the

officers to the DPS station. The consent to the second search occurred off-camera and the only evidence of the consent was from the testimony of the officers. There is, however, no evidence contradicting the testimony of the officers.[2]

Defendant Beltran's understanding that he was free to leave or decline to consent to a search, as the government argues, is demonstrated by his former arrest where he refused consent to a search of his person. There is the additional factor, however, that one of the investigating officers (Trooper Honesto) told Beltran that "he knew he was loaded," essentially accusing Beltran of a crime. A reasonable person, accused of a crime by a law enforcement officer, could, arguably, not believe they were free to leave or decline the officer's orders. Here, however, the Trooper asked Beltran to come, implying that he was free to make a choice. Beltran seemingly understood that he had a choice as demonstrated by his laughter and casual answer to the question. The Court finds a reasonable person in Beltran's position would have felt free to decline to consent.

Again, there is no evidence showing the lack of intelligence or knowledge of the defendant. As previously discussed, the drugs were well hidden, and defendant may have believed the drugs would not be found. There is no evidence Beltran knew the extent of the officers' knowledge of secret compartments in the type of vehicle he was driving or the sophisticated methods officers use to uncover contraband. All factors considered together, the court finds defendant's consent to the second search was voluntary, especially in light of Beltran's specific agreement to go, *i.e.*, "Let's go."

Even if defendant's consent to the second search was found not voluntary, the search was still constitutionally valid because the officers had developed not only reasonable suspicion, but probable cause to search the vehicle.

---

[2] The Court does not consider Beltran's invocation of his Fifth Amendment right to abstain from testifying against him for any purpose. However, the Court will not assume the existence of facts for which no testimony or evidence has been offered.

The general rule under the Fourth Amendment is that searches of private property are unreasonable unless they are conducted pursuant to a warrant issued upon probable cause or fall within one of the limited exceptions to the warrant requirement. *See, e.g., Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Police may lawfully conduct a warrantless search of a vehicle if they have probable cause to believe the vehicle is transporting contraband. *See, e.g., United States v. Ross*, 456 U.S. 798, 823, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982) ("[A]n individual's expectation of privacy in a vehicle and its contents may not survive if probable cause is given to believe that the vehicle is transporting contraband.").

> The Fourth Amendment generally requires police to secure a warrant before conducting a search. As we recognized nearly 75 years ago, there is an exception to this requirement for searches of vehicles.... [I]n cases where there was probable cause to search a vehicle a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained.... If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more.

*Maryland v. Dyson*, 527 U.S. 465, 466–67, 119 S.Ct. 2013, 144 L.Ed.2d 442 (1999) (per curiam). The Fifth Circuit has held that evidence of either a non-standard secret compartment added to a vehicle or evidence of recent access of a non-visible secret compartment is sufficient to support probable cause. *See United States v. Banuelos-Romero*, 597 F.3d 763, 768 (5th Cir. 2010). In *Banuelos-Romero*, the Fifth Circuit held that signs of replacement of a windshield, combined with a suspicious change in the searched car's emblem and suspicious behavior by the suspect, was sufficient to support probable cause. *Id.*

In this case, Trooper Nunez observed defendant Beltran behaving suspiciously, traveling along a known drug corridor, from a known drug destination (Arizona), after recently crossing the United States-Mexico border. Additionally, upon receiving valid consent for an initial search, the officers observed that some of the grommets on the bumper cover of the Jeep had been recently changed, and

noticed hand prints on the underside of the bumper of the car. Trooper Nunez knew from his experience and training that drug traffickers access the hollow frame rails of that type of vehicle by removing the bumper. While there were no modifications to the emblem of the vehicle as in *Banuelos-Romero*, the other factors identified are sufficient to support a finding of probable cause.

## IV.
## RECOMMENDATION

It is the RECOMMENDATION of the United States Magistrate Judge to the United States District Judge that the Motion to Suppress filed by defendant FRANCISCO JOSUE BELTRAN be DENIED.

## V.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a copy of this Report and Recommendation to each party by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this ___13th___ day of February 2015.

CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

* **NOTICE OF RIGHT TO OBJECT** *

Any party may object to these proposed findings, conclusions and recommendation. This case is set for docket call on February 23, 2015. Consequently, the time in which to file objections is shortened. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is **on or before February 17, 2015**.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir. 1988).